1  ROBERT WAGGENER - SBN - 118450
   214 DUBOCE AVENUE
2  SAN FRANCISCO, CA 94103
   Phone:       (415) 431-4500
3  Fax:         (415) 255-8631
   E-Mail:      rwlaw@mindspring.com
4

5  Attorney for Defendant DRAY MOSBY

6

7              UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA          No.  CR 17-00389 RS

                    Plaintiff,       **DEFENDANT DRAY MOSBY'S**
11                                    **SENTENCING MEMORANDUM AND**
                                      **REQUEST FOR DOWNWARD**
12        v.                          **VARIANCE [18 U.S.C. § 3553 (a)(1)**

   DRAY MOSBY,
13
                    Defendant.        Date:   May 7, 2019
14 _____/  Time:  2:30 p.m.
                                      Judge: Honorable Judge Richard Seeborg
15

16

17                    **INTRODUCTION**

18        53 year old defendant DRAY MOSBY appears before this Court for sentencing following

   his conviction of Conspiracy To Distribute Methamphetamine 21 U.S.C. §846 and 21 U.S.C.
19
   §§841(a)(1) and (b)(1)(B)(viii). The Presentence Report (PSR) was prepared by United States
20
   Probation Officer Aakash Raju and he has calculated Mr. Mosby's guidelines to be a Total
21
   Offense Level 27, with a Criminal History Category of II, calling for an advisory guideline
22
   sentence of 78 to 97 months. Mr. Raju has recommended that Mr. Mosby be sentenced to the low
23
   end of that guideline range, 78 months in prison. Defendant objects to the probation officer's
24
   sentencing recommendation.  Mr. Mosby faces a mandatory minimum sentence of five years
25
   based on the technical amount of methamphetamine connected to his criminal conduct. (57.3
26
   grams).  It is submitted that any sentence greater than 60 months is unjustified and inappropriate.
27

28

**DEFENDANT MOSBY'S**
**SENTENCING MEMORANDUM**

# I.

## __THE OFFENSE CONDUCT__

Mr. Mosby has been convicted of brokering a methamphetamine transaction to a confidential informant.  He was not present for the transaction and his crime is basically one of providing contact information to the informant for his co-defendant drug supplier, Jennifer McPike.

Operation Cold Day was an investigation conducted by the Bureau of Alcohol Tobacco and Firearms (ATF) featuring a paid confidential informant who set up numerous narcotics and firearms transactions with individuals around the Bay Area.  A centerpiece of the operation was a phony warehouse in Daly City equipped with sophisticated audio and video equipment where the informant would set up transactions and introduce suspects to undercover agents posing as his confederates.  These types of operations are known as ATF Undercover Storefront Operations, and were investigated by the United States Department of Justice Office of the Inspector General, leading up to a report issued in September 2016. (Attached hereto as Exhibit A).   These "sting" operations are routinely used to create criminal conspiracies, convince individuals (who are disproportionately ethnic minorities) to join them, and then prosecute them for committing crimes that the ATF has designed and created.  This practice has been widely criticized by the judiciary, the press, and even the United States Congress. The ATF's Daly City Operation Cold Day netted approximately 60 federal defendants, and an unknown double digit number of defendants prosecuted by state authorities.

The operational centerpiece of the ATF's investigation was a Los Angeles Crip gangster paid over $100,000 for his work as a confidential informant.  The informant actively recruited people all over the Bay Area to sell him drugs or guns directly, or to give him contact information for people who could sell him drugs or guns.  Much is known about this informant because of investigation by various defendants, and because the informant recently testified in a local federal drug case where the defendant was acquitted based on an entrapment defense. (*United States v. Lopez*- CR 17-00334 WHO).  This particular informant went so far as to go to neighborhood playgrounds in several  poor neighborhoods to try and cultivate drug and weapon

1  connections, including providing drugs to minors as part of the process.  The ATF's use and
2  oversight of confidential informants has recently been severely criticized.  (See U.S. Department
3  of Justice Office of the Inspector General Audit of the Bureau of Alcohol, Tobacco, Firearms and
4  Explosives' Management and Oversight of Confidential Informants published in March 2017,
5  attached as Exhibit B).

6       As discussed in the Addendum to the Presentence Report in this case, information was
7  provided to the probation officer in this case regarding the informant and Operation Cold Day in
8  order to provide some context to the drug transaction which lead to charges against the
9  defendant.  Not sure of the relevancy of the information, and whether it should be included in the
10 PSR, the probation officer deferred to the Court.

11      Here is why the information is relevant.  Before getting there, it is important to emphasize
12 that Mr. Mosby takes full responsibility for his conduct in brokering a drug deal, but it is
13 important to understand how and why that conduct came about. In February 2017, the informant
14 was trolling the San Francisco Tenderloin neighborhood pursuing his Operation Cold Day
15 assignment to locate drug and weapon connections.  In that pursuit, he came in contact with
16 homeless, drug addicted Mr. Mosby, and tried to establish a relationship.  A month later in
17 March of 2017 there was an exchange of phone calls between the defendant and the confidential
18 informant where the informant was seeking someone to sell him methamphetamine.

19      The phone conversations and text exchanges ultimately lead to Mr. Mosby providing the
20 phone number to the informant of drug supplier and now co-defendant, Jennifer McPike.  The
21 informant got in touch with Ms. McPike,  and that lead to the drug transaction where Ms. McPike
22 sold 57.3 grams of methamphetamine to the informant at the Daly City undercover storefront
23 warehouse.  Ms. McPike first provided a quantity of drugs that was two grams short.  When
24 notified of the shortage, she then returned to the warehouse about an hour later and provided
25 additional drugs. (See PSR ¶ 9).  Before departing, Ms. McPike discussed the future sale of a
26 firearm, and then went on to set up the sale of the firearm to the informant by the third co-
27 defendant in this case, Efrain Santamaria.

28

**DEFENDANT MOSBY'S**
**SENTENCING MEMORANDUM**

1   Mr. Mosby never physically introduced the informant to Ms. McPike and never went to

2   the Daly City warehouse.  His involvement in the single drug transaction was a matter of phone

3   communications to provide the contact information for Ms. McPike.  After March 2017,

4   Operation Cold Day continued, and Mr. Mosby had no further contact with the informant.  In

5   July 2017, Mr. Mosby was indicted for the drug transaction, and then in November 2017 was

6   arrested while riding a bicycle in the Tenderloin.(See PSR ¶ 41).

7   The methamphetamine sold by Ms. McPike weighed 57.3 grams and was quite pure,

8   containing a net weight of 56.7 grams of methamphetamine.  The government charged the case

9   against Mr. Mosby as a five year mandatory minimum case and never backed off, making Mr.

10  Mosby ineligible for the CAP program based on the eligibility requirements for participation in

11  the program.  Relevant to the application of the five year mandatory minimum in this case is the

12  recent Ninth Circuit case of *United States v. Branson* 2017 U.S. Dist LEXIS 122639.  A copy of

13  the decision is attached as Exhibit C, and it discusses the twin goals of the United States

14  Sentencing Guidelines for uniformity and proportionality, and how the current guidelines for

15  methamphetamine create a disparity that undermines these sentencing goals.  Mr. Mosby had no

16  idea of the purity of the methamphetamine Ms. McPike was selling, but it was enough to qualify

17  him for a five year mandatory minimum and boost his guideline offense level. He is now saddled

18  with that statutory responsibility.

19  Mr. Mosby was arrested and made his first appearance before Magistrate Judge Sallie

20  Kim on November 26, 2017 and was remanded in to custody.  On December 4, 2017, Magistrate

21  Judge Kim released Mr. Mosby to a residential drug facility and set numerous conditions for his

22  release.  Mr. Mosby first went to the Newbridge residential drug treatment facility in Berkeley,

23  but was later transferred to the Center point residential facility in San Rafael.  Mr. Mosby

24  successfully completed the 90 days of residential treatment, and then as part of his aftercare was

25  released to a sober living environment (SLE).  Mr. Mosby left the SLE on March 25, 2018 and

26  did not return.  An arrest warrant was issued for Mr. Mosby and he remained a fugitive until June

27  26, 2018, when he was arrested by U.S. Marshals in the Tenderloin district of San Francisco.

28  He has remained in custody ever since.

**DEFENDANT MOSBY'S**
**SENTENCING MEMORANDUM**

.

## II.

## THE PRESENTENCE REPORT

Other than the issue of the inclusion of the contextual information regarding the informant and Operation Cold Day in the PSR, all factual and legal issues regarding the PSR have been resolved.  The dramatic and sad personal and family data for Mr. Mosby is aptly summarized within the report, particularly Mr. Mosby's issues with abandonment, anger, and depression.  It is also very clear that Mr. Mosby has a long history of substance abuse, though he has been successful in residential treatment on at least two occasions.  Mr. Mosby has also demonstrated that he is capable of leading a law abiding life and holding down sustainable employment.  For seven years he was licensed as a transit driver, shuttling Genentech employees to their various campuses. (See PSR ¶62)  Any sentence for Mr. Mosby should clearly contain a recommendation that he be allowed to participate in the Bureau of Prisons' RDAP program.

## III.

## SENTENCING RECOMMENDATION BY THE PROBATION OFFICER

The probation officer recommends a sentence at the low end of the calculated guideline range, but recognizes that the personal history and characteristics of the defendant, as well as sentencing disparity issues, may warrant a variance from the guidelines. (PSR ¶82) Defendant submits that there is more than ample evidence to vary from the guidelines in Mr. Mosby's case.

## IV.

## ANALYSIS PURSUANT TO 18 U.S.C. § 3553(a) AND SENTENCING RECOMMENDATION

The primary directive in § 3553(a) is that the court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. *See*, 18 U.S.C. § 3553(a) Those purposes include the need:  (1) to provide just punishment; (2) to create adequate deterrence; (3) to protect the public; and (4) to provide the defendant necessary treatment and training.  18 U.S.C. § 3553(a)(2). The Court has discretion to sentence Mr. Mosby below the applicable guideline range as long as the sentence is not unreasonable in light of the other 3553(a) factors.

DEFENDANT MOSBY'S
SENTENCING MEMORANDUM

1

2 **A.    Personal History and Characteristics of the Defendant**

3    Mr. Mosby's mother put him up for adoption when he was born, maintaining custody of

4 her other children.  Although his mother brought him back in to her life when he was four years

5 old, Mr. Mosby has never really gotten over his feelings of abandonment and an inability to trust

6 others.  He grew up in the middle of the crack epidemic and fell prey to its evil.  He has struggled

7 with drug addiction ever since.  He never had a father or a male role model in his life, and he

8 dropped out of school at an early age.  It has been a life of struggle for Mr. Mosby and the Court

9 should take this history in to account.  He is now 53 years old and faces at least another four

10 years in prison.  Even the applicable five year mandatory minimum is excessive under the

11 circumstances of this case.

12 **B.    Disparity in Sentencing**

13    The issue of disparity in sentencing issue pursuant to 18 U.S.C. §3553(a)(6) was

14 recognized by the probation officer in this case, but never specifically addressed. The issue of

15 sentencing disparity is particularly poignant in this case, both in terms of Mr. Mosby's co-

16 defendants, and other defendants caught up in Operation Cold Day.  Mr. Mosby's two co-

17 defendant's, Ms. McPike and Mr. Santamaria, have both been allowed to participate in the CAP

18 program, and apparently have been successful in that program.  Mr. McPike is of course the

19 person who actually sold the informant the fifty plus grams of methamphetamine, and then set up

20 the gun sale with Mr. Santamaria.  She is scheduled to be sentenced in July, but she clearly was

21 not prosecuted on the basis of 5 year mandatory minimum drug weight, otherwise she would not

22 be eligible for the CAP program.  Mr. Santamaria was sentenced today by Judge Orrick after

23 graduating from the CAP program.  He received a sentence of time served, with three years of

24 supervised release.  Thus, the situation is that even though Mr. Mosby did not directly participate

25 in a drug or gun sale, he now faces the heaviest and most severe sentence of the three defendants.

26 That is simply not fair, and there is absolutely no reason he should receive more than a five year

27 sentence. The arbitrary prosecutorial decisions of the government in this case are truly hard to

28 understand, and mean spirited in their application to Mr. Mosby.

**DEFENDANT MOSBY'S**
**SENTENCING MEMORANDUM**

Counsel is not aware of the specifics of all of the Operation Cold Day prosecutions and the sentences meted out to the various defendants, but is aware of one particular case very similar to the case against defendant Mosby, *United States v. Ochoa and Dominguez* CR 17-00375 JST. Counsel represented defendant Dominguez in that case.  In August of 2016, as part of the Operation Cold Day investigation, the two defendants participated in a hand to hand sale of 7.2 grams of actual methamphetamine to the central confidential informant at the Daly City "sting" warehouse.  There was just one transaction, but the weight of the methamphetamine was technically sufficient to carry a five year mandatory minimum.  Defendant Dominguez had a Criminal History Category of III.  Pursuant to a conditional plea agreement where the five year mandatory minimum was not alleged, Mr. Dominguez was sentenced to a four year prison term by Judge Tigar.  The co-defendant, Mr. Ochoa, was allowed to participate in the CAP program with the approval of the government.

The Ochoa and Dominguez case was a single, relatively low level methamphetamine sale, just like the case against Mr. Mosby.  Mr. Mosby's involvement in the single drug transaction was far less than that of Ochoa and Dominguez because they both took part in the actual hand to hand sale of the drugs.  Nonetheless, Mr. Mosby now faces a significantly higher sentence than Mr. Ochoa, and Mr. Dominguez, facing a minimum sentence of five years in jail.  It would be grossly unfair and unjust to sentence Mr. Mosby to more than five years in prison.

## CONCLUSION

For the foregoing reasons, Defendant requests this Court to impose the sentence suggested above. Defendant requests the Court to recommend to the Bureau of Prisons that he be housed as close to the Bay Area as possible. It is unnecessary to impose a fine in this case. The issue of bail bond forfeiture is addressed in a separate set of pleadings.


Dated: May 2, 2019                              Respectfully submitted,


                                                _/s/_____
                                                ROBERT WAGGENER
                                                Attorney for Defendant
                                                DRAY MOSBY

**DEFENDANT MOSBY'S**
**SENTENCING MEMORANDUM**